May it please the Court. My name is Brittany LaCaia and I represent the appellant Earlie Dickerson. With this Court's permission, I would like to reserve five minutes for rebuttal. There are eight issues pending in this appeal, however, several of the issues are connected to each other and I want to address the following issues during the oral argument. First, the District Court erred in denying the appellant's motion for a new trial and denying the evidentiary hearing. Second, the District Court erred in enhancing Dickerson's offense level by 18 levels for its loss calculations and erred by ordering Dickerson to pay $1,192,382.94 in restitution and ordering the same amount in a personal money judgment. Next, the District Court erred in enhancing his offense level for an offense involving 50 or more victims. And finally, the District Court plainly erred by omitting evidence of Graham's confession through Agent Hopp's testimony, which inculpated the appellant without affording him the constitutional right to confront his accuser. Regarding the denial of the motion for a new trial, there are five elements typically required for a motion for a new trial to be granted. That's called the Berry Rule. The defendant must prove the evidence is newly discovered and was unknown to the defendant at the time of the trial, that the failure to detect the evidence was not due to a lack of diligence by the defendant. The evidence was not merely cumulative or impeaching, that it was material, and that if introduced at a new trial, it would probably result in an acquittal. Now the question about you sort of present this in two ways. The bottom line is you say this witness had a deal for five years, but didn't say that at trial, and it came out later, and there's this recording and everything. So you first present it just as if this evidence came out that the witness had lied. And then your second sort of alternative argument is if the government knew about this and withheld it. Wouldn't the government — if, indeed, you're right that he had a five-year deal, wouldn't the government have to know about it? Because who else could have given him that deal? I would believe the only other interpretation — I mean, obviously, I think it goes to what he believed at the time that he testified, but it's possible that potentially his defense counsel might have informed him that he believed he was going to get a five-year deal. We don't know unless we have that evidentiary hearing. All that we know at this point is at the time that he testified, he was testifying under the impression that the most he was going to get was a five-year. On the tape, he never says the government promised me or the government told me. No. He never specifically said who told him or why he was under that impression. But he made it very clear that he was testifying with a cap of five years. Only about if you cop, right? He says if you cop, you get five years, cop employee. Yes. The most you can get is five years for copping out was his term, and the max you can get is five years. He said that he was guaranteed his sentence would not be over five years. So it's very clear that that was his understanding at the time that he was testifying. But it's still ultimately in the discretion of the government. Yes, but I think the case law in the Fifth Circuit, especially under Tassin v. Cain, is that it doesn't have to be a promise. It doesn't have to be a guarantee. They said that it's the crux of the 14th Amendment, violation is the deception. That's really not the issue, directly. The question is whether he really understood exactly what the deal was and that he misstated the deal. And you look at the language he used about what he hoped for. Well, Your Honor, I believe that when he was testifying, the testimony that he provided, they asked him, they said the plea agreement doesn't state anything about you getting less time in prison, does it? He said no. The defense counsel said, well, is that sort of an understanding that you will get less time in prison if you testify? And he said, no, that's not the understanding I get. The defense counsel said, that's not your understanding, and he said no. So he's testifying that he doesn't think he's going to get less time, but he was. He did think that. What do you say to the suggestion that it's not inconsistent for him to say that he doesn't have a deal for five years, when ultimately the government has the discretion, depending on his performance or not, to ignore those suggestions? So he's hoping for something that the government has not fully assured him of, if they have ultimate discretion. Well, I think that goes to his testimony and the bias, is that his testimony has to be consistent with what they believe he's going to testify to, so it gives them more of a bias to provide the information that they want. And I think, like I said, it goes down to what he believed. It doesn't have to be a promise under Tassin. So even though the government, yeah, the court could have gone and said, okay, I sentence you to longer, the testimony that he provided at the time and what he was under the belief of was that it was going to be five years at the max. What happens afterward isn't relevant to what his understanding was at the time that he was testifying. Even if you're right that he had this understanding he'd get five years, and we don't really know what the facts are because there wasn't a hearing. But even if that's true, I mean, how would that have changed the result at trial? Because that's not a sweetheart deal. I mean, five years for a cooperator in a fraud case is fairly substantial. So why would that have made the jury discredit his testimony in really the entire case against your client? Well, I mean, five years in comparison to the 168 months that my client received is quite small in comparison. But I think that that's But the jury doesn't know that. I mean, they don't know what your client's going to get. Correct, Your Honor. But I think when he's just testifying that he doesn't have an agreement for less time and that he just is there to tell the truth and he's just there to testify and get, you know, get sympathy with the court is kind of what he's testifying to, makes it seem like he's not there with the bias that he was there with and the reason to provide the testimony for the government that they're looking for. And he was pretty much the main witness. He was the first witness called by the government. He provided very incriminating evidence against the client that was weak elsewhere, specifically regarding his understanding of the billing problems. So we not only have the problem at the beginning of the trial with Marion Young, who's the first witness, later on we have the problem with Edward Graham, who's the last witness called by the government regarding the statement, I mean, Agent Hopp, who testified regarding Edward Graham's statement. So the trial ends with a problem and begins with a problem. And those are the most incriminating evidence against the client, and both of them have issues. So when you combine all of them together, it's just not a fair trial that was provided. Now, this is — and that goes to the reason why we need the evidentiary hearing, would be to call the prosecutor on the stand, Al Balboni, and ask him or get an affidavit from him regarding what was communicated to defense counsel. Why did he have an understanding of five years? Was that an estimate that he gave? We don't know unless we have that. We just know that he was testifying with that belief. Also, we wanted to call defense counsel, Marion Young's attorney, to find out what information was communicated to him, to see if there is a Brady violation here. And that's also important because that would also reduce the standard for a newly discovered evidence for a motion for a new trial, because a new trial is justified based on false testimony. If there is any reasonable likelihood that the testimony affected the judgment of the jury, if the government knew that he was testifying with that understanding, he would only receive five years. It would reduce his burden under the motion for a new trial. So that's another reason why the evidentiary hearing was important. Next, regarding the loss calculations here, I think the biggest issue here is that the presentence investigation report didn't have the indicia of reliability that it needed. It pretty much listed up to 45, or they claimed 50, over 50. Victims that are not named in the indictment, there was no evidence introduced at trial against them. There is 13 or no, 12 victims named in the indictment where there was evidence introduced at trial. The other ones, they just put the name out there, put a number out there. Almost all of these cases, relevant conduct can come in at sentencing if it's proven by a preponderance. So why isn't the information in the presentence report sufficient under that? Well, those are just bald conclusory allegations. And that's just not enough to satisfy the — you can't just put a number out and ask the defendant to go through and pick through each one when they don't even know where they're coming up with these numbers or the victims. They're not mentioned anywhere. It doesn't say how they are part of the same scheme or course of — Kennedy. Didn't they have the billing records from the insurance companies? I mean, they had the billing records from the insurance companies, right? No, there's not in the evidence, not for these additional alleged relevant conduct. That's not anywhere. We don't have any of those records. All we have is a name and a number. So I don't know how they prove that by a preponderance. But I'm saying in what's been provided, usually what happens is the FBI agent or whoever investigated the case gives the file to probation. Sure, probation doesn't include the huge file in the presentence report, but they take that information and write it up. Well, we don't know that. All we know is we have a name and a number. We don't know how they show that those are — that a crime was committed in order to come up with that there are victims or to come up with the amount of loss. It doesn't say what crime the defendant committed in those. And if you look at Venn's, it comes — what the Fifth Circuit found there is that you can't just assume that it was the same scheme. It was — it sounded like it could have been with the foreclosure properties, but there wasn't evidence. The Court said that the district court didn't make any factual findings. It did not discuss which crimes Venn's committed. That's the same issue here. There was no factual findings regarding what offense Dickerson committed regarding the other alleged relevant conduct. The PSR included the total amount of loss for the ten foreclosed properties without explaining which causes. It's the same situation here. And that the Fifth Circuit found that they weren't able to determine whether Venn's dealings with the homebuyers and sellers were criminal. It's the same situation here. We have no way to find out whether or not they're criminal, just looking at that PSR with a name and a number. And the government seems to want to say, well, you didn't come here and you didn't — not only first to prove the amount by the preponderance of evidence, because they have the burden regarding the loss amount, but they have to get there first before we even can come back and say, hey, look, some of these were valid charges, which the district court here did make findings of two months later when he sentenced Edward Graham under the same facts, whereas he said, okay, in Dickerson's case two months earlier, okay, we want this to be intended loss. Then two months later, when Edward Graham was sentenced, he said, hey, I can't determine the intended loss in this case because there were valid claims, and we did supplement the record on appeal to include that transcript. He said, no, we're going to go by the actual loss here, and reduced his sentence when he had denied Dickerson's objection to the same exact issue. So the district court did find that there were valid claims, so not only — Alito. That is concerning, but do you have any cases where something like that has happened, two exact, you know, defendants who are situated the same on an issue, and the court rules one way for one and the other for another, and we've said that's — that's a problem? I don't, Your Honor. I don't have a specific case on that. A legal problem. I just think that it is the same case, although it's two different co-defendants. This is the same case, and he did make — But let's say he was wrong in the other case. What is the — what do we do with — Well, not that I have a loss amount. He was right in your — with your defendant and wrong in the other. Well, I think that's the government's argument regarding the organizer-leader situation, but they didn't make that argument regarding the loss amount. The loss amount, we're arguing that that was definitely right in Graham's case, that you can't determine the loss amount in this case because there's no distinction between the valid claims and the allegedly invalid claims. So I don't — the government's not saying that it was right in our case and wrong in Graham's case. I was — I think that was their argument regarding issue number 8, regarding the organizer-leader enhancement. The government — the district court was very clear in — You're saying the government's acknowledging the loss amount's wrong in this case? No, I don't think that they distinguished. I think they made the distinction on issue number 8 that we can't just — that the issue was they did it right in Graham's case and not in Dickerson's case. But the district court even said in Graham's sentencing hearing that if I was wrong in Dickerson's case, which — because Al Balboni, the prosecutor, said, well, you did it differently in Dickerson's case. He said, well, the Fifth Circuit will tell me if I did it wrong, but I think this is the right way to do it now. So he specifically acknowledged that he did it different there, but he thinks he's doing it right now, and he wants the Fifth Circuit to tell him. So that was — that's all in Graham's sentencing hearing. So, the government didn't meet their burden regarding the loss amount in this case. They didn't — there's no evidence that you can say that this was reliable. And not only that, but they — the relevant evidence they cited to you was the other clinics mentioned and other offenses. It was just a very vague statement regarding the relevant conduct in the case. Are you going to argue your prudent point? Your prudent point, are you going to argue it? Are you going to argue your prudent point? Which issue would you like me to argue, Your Honor? Prudent. Prudent. Oh, prudent. Yes, Your Honor. Well, in this case, Edward Graham's confession was introduced through Agent Hobb. That — the district — or the government's main argument is that the defendant is only implicated when linked to other evidence. However, Graham specifically, through Dick — through Hobb, said that he brought it to Dickerson's attention, specifically naming Dickerson, that there were problems with the billing. And like I said, that was the weakest part of the evidence in the case, is Dickerson's knowledge regarding any billing problems, because the billing was really done at the chiropractic clinics when Dickerson was the manager of the law firm. So it doesn't require linkage. Additionally, in Gray v. Maryland, they said you can't just substitute blanks in the word deleted for the person's name, which is, in essence, what they're doing when replying to Sanjo and Associates, because their whole theory is that Dickerson was really the one in charge of Sanjo and Associates. So they can't say that requires other linkage when it's really just replacing one with the other. I mean, the lawyers at Sanjo and Associates weren't even charged in the criminal offense. And it was also Hobb who testified that Graham told him that it was Dickerson who would send patients over from Sanjo and Associates if he opened up the clinic. Now this is also, like I said, it's very harmful. It was the last testimony that the jury heard before they retired for deliberations. Not only did you have the problem with Young's testimony, now you have it at the closing. The last witness, you have the problem with the Bruton error. So altogether, it just produced an unfair trial. I'm going to serve the rest of my time. I'm on a vote. Mr. Smith. Good morning. May it please the Court, Jason Smith of the United States. I want to turn first to a couple of questions that Judge Costa had. First, with respect to the information in the PSR, at page 2588 of the record, the probation officer reports that the information regarding this offense was obtained through investigated material provided by the U.S. Attorney's Office, the FBI, and the National Insurance Crime Bureau, and further corroborated by various co-defendants and co-conspirators, including Heather Cash. This simply is not the case of a bunch of unsupported conclusory numbers being thrown into the PSR. The evidence at trial and laid out in the PSR shows one overarching scheme. Dickerson, Graham, and their co-conspirators, through the San Joaquin Associates law firm, through a series of chiropractic clinics, trumped up and vastly inflated chiropractic bills in order to obtain improper settlements of auto insurance claims. The conspiracy was, as I understand it, just to make up specials to either enhance or to create claims for settlement purposes. There was a range in terms of the actual accidents. There were real accidents. There were staged accidents. There were then injuries that went along with those. There were some real injuries, completely fake injuries, and then injuries that were vastly overstated. But the treatment, as Dr. Lindsey, the treating chiropractor for most of these testified to, he wasn't really concerned with people's progress on treatment. The bills were a means to submit to the auto insurance companies in order to drive up, as Dickerson told many of the clients, to get as high a settlement as possible. Go to the chiropractor as many times as possible. That's how you're going to get the most money. What does the evidence show as the approximate total amount of the fraud that was perpetrated? There were about $5.7 million worth of settlement demands sent to the insurance companies, including both relevant conduct and the actual time period charged in the conspiracy. I also want to come back to one other thing that Ms. Lacayo said. The government does not and never has conceded that the district court got the loss calculation correct at Mr. Graham's sentencing. We think that the district court erred at that sentencing with respect to the loss amount, with respect to the number of victims, and with respect to the way it was determining the leadership role. Leadership's a little bit different because that's Graham's sentencing, and that's a more individualized assessment, and not something that carries over as much. Just to point out one inconsistency error in the district court's determination at Mr. Graham's sentencing, the court still ordered $1.192 million worth of restitution there. That restitution number flows from the actual $5.7 million loss number. All $5.7 million of that loss, of those claims, had to be fraudulent in order for $1.192 million, the total amount paid out by the insurance companies, to be an appropriate measure of restitution. At Mr. Dickerson's sentencing, the court applied the proper methodology. There was a single overarching fraud scheme proven. The scheme showed that essentially everything submitted was just a means to an end to drive up these settlements. The court was well within its discretion and within the case law in Sharma and Jones to say, if you, defendant, want to show an offset, if there was some validity to any of those claims, the burden is on you to come forward with evidence.  There was no error in assessing the loss amount at Mr. Dickerson's sentencing or in any of the other sentencing calculations there. Turning for a second to the new trial motion. He does, I mean, this recording, he says, a number of times he says things that are completely consistent with the plea agreement, which is, I don't know what the sentence is going to be, the judge has to decide. But he also does say on multiple occasions that can be read as saying he was going to get five years. So where do you think that came from? I think just thinking as a person, the sloppiness of speech that sometimes folks engage in whenever they're not carefully thinking about every ramification of what they're seeing. I think that risk of people speaking imprecisely is one of the reasons that this court has the Berry Rule because it is easy to go out and get someone engaged in a conversation where they say something that seems like maybe it's in some way impeaching as to what they testified to when they were under oath and carefully testifying, taking very seriously what they were saying. And if this court were to get rid of the Berry Rule and allow new trials and require hearings every time something like that happened, there would be a pretty large waste of judicial resources in terms of sussing those things out. That's also the reason why this court vests so much discretion in the trial judge, the trial judge here who took Marion Young's plea, who saw Marion Young testify, who knew that plea agreement inside and out. And just to turn back to a question you asked earlier, who could have promised Young five years? The only person who could have promised Young five years is the district judge. And the judge recognized that when he denied the new trial motion. He's the only one who could guarantee it, but a prosecutor or someone else could say, well, I'm going to ask for five years. That's all I'm going to ask for. Right, but that's not what the new trial motion was predicated on. The new trial motion was predicated on he had a promised five-year deal that he lied about and hid from the jury. In fact, he testified that he was hoping for a lesser sentence. He testified to that on direct. Yeah, his whole time, I don't know which way this cuts, it just seems his whole testimony during trial and then after was confused. He says, well, is that sort of an understanding that you will get less time in prison if you testify? And he says no. And I found that kind of shocking because everyone knows these folks are testifying. There's no guarantee. But every trial they say, sure, I hope, I hope the judge is going to give me a reduction for this. And he's saying that he doesn't understand that he's going to get less time if he testifies? That sounds accurate to me. There is no guarantee. He can't at that point not to try to get less time. But the question wasn't whether there's a guarantee. It's just whether there's an understanding. Right, and if he doesn't understand that that's a certainty, I can see where someone would say, I do not understand that I am guaranteed less time here. And I believe that's on cross-examination, if I heard the testimony correctly. It is, right. To back up in looking at is there some sort of impeachment value from those tapes, you have to listen to them in context. And multiple times at Track 1, I mean 622 and 830, Mr. Young talks specifically about how his obligation is to tell the truth. And if he doesn't tell the truth, he will lose his plea agreement. He also says at Track 2 that the prosecutor couldn't offer him anything, that he can only make a recommendation and it's the judge who sets his guidelines. You know, the prosecutor on a redirect can clarify a lot of those things. The prosecutor sits there and lists the cross, and you get this kind of a garbled picture about what's there. And since the prosecutor has a perfect opportunity to come back on redirect and make it quite clear what the understanding is between the witness and the government, and they don't do so. It bothers me. I understand your concern, Your Honor. I don't see what the uncertainty was or the garbled nature of the testimony. Well, that's sufficient. It's distaining. You make it serious. It makes an argument on appeal, and we're engaged in an alcoholy about that, etc., etc. Well, the trial counsel knew darn well this was left uncertain, and he didn't clarify it. Or did he? I don't know that it was uncertain from his point of view. Mr. Young had testified, I have a plea agreement. I'm talking about the lawyer, the prosecutor here, not this particular. The uncertainty about the deal with the government, the prosecutor knows, I assume, what the deal was or was not, right? And the deal is the deal that was in the plea agreement that was Government Exhibit 406. All right. I won't push you harder than that. You're arguing here about the $5.7 million in restitution. What's the realistic possibility here of collecting any money at all? Well, there's only $1.19 of restitution. Well, the PSR said it was accountable for an intended loss of $5.7 million and so forth, but you end up with a very large restitution order. That's nice paper. What are the facts here? Is there something realistic there? I don't know what the facts are of Mr. Dickerson's ability to pay that restitution order. I do know that restitution is required regardless of his ability to pay it. Absent of another scheme of some sort, I doubt that he could pay it. Just not to go too far. It matters. I mean, we just argue about the hypothetical situation. A lot of time to do that. There was some evidence that he was involved in another scheme while he was awaiting sentencing. I don't know if any of that money was recovered to pay restitution here. I don't want to leave the court with any misunderstanding or an inability to answer questions about the plea agreement. The plea agreement was Government Exhibit 406. It was marked at trial. Mr. Young was asked about it. It contained a paragraph saying if he provided substantial assistance, the government retained the right to make a 5K motion. It reflected that his maximum sentence was 20 years on each of the two counts that he pled guilty to, and that was the deal. There was no deal for a five-year cap. But he got five years. He did. That's some corroboration of what's on the tape. Well, just to back up to the comment. Because he's saying five years, and then it turns out he gets five years. Sure, and with 20-20 hindsight, it's very easy for things to look pretty suspicious. Which is why not have a short hearing to flush it all out. I understood, Your Honor. A couple of things about the context of those tapes. The context of those tapes is largely Mr. Young saying Mr. Dickerson was a fool for going to trial because he should have taken the same plea agreement that everyone else took, that Chase Lindsay took, that Brittany Jessie took. And when Mr. Young is talking about the terms of the plea agreement, he describes it pretty consistently as everybody getting the same deal. Well, what was the maximum sentence made out of this whole transaction? What's the longest sentence imposed? I believe that Mr. Dickerson got the longest sentence imposed. I don't remember. What were the years? Mr. Dickerson got 168 months. I know that Mr. Graham got 80 months. Mr. Young wound up with 60 months. Ms. Jessie, I think, was in the range of two years, but I don't remember for sure. And I think the chiropractor, Dr. Lindsay, also got in the range of two years. Those folks are all, apart from Mr. Graham, where we think there were pretty serious guidelines errors in the calculation, those folks are all differently situated than Mr. Dickerson by virtue of much lower criminal histories and having pled guilty and accepted responsibility. Just to back up, though, that plea agreement that Mr. Young is describing, he describes as having been offered to everyone. None of those plea agreements included a five-year cap, which goes into the bucket of evidence showing that Mr. Young is being imprecise. He is not properly describing what the terms of the plea agreement were. And there's also nothing in his description of the plea agreement. Let me ask you another question. Look at this verdict form. You get a mail fraud type allegation or whatever, but you went to trial on 30 counts. What? I mean, philophony, I don't know what the purpose of that exactly is unless you're concerned. Why 30 counts? I wasn't involved in the charging. You don't have to plead guilty or innocent. I just don't understand that. I'm afraid I do understand it, but I thought we've long since gotten the message back that you don't just take the mail fraud statute, which you can take and multiply out as long as you want, and you can create maximum sentences in theory for it all the way up. But then you've got about 30 counts. First of all, it can be confusing to the jury, et cetera, et cetera. They didn't have any trouble. They answered guilty on 31 counts. The evidence was pretty overwhelming, Your Honor. I don't think it was hard for them to reach that conclusion. The U.S. Attorney's Office, exactly what Judge Higginbotham is saying, the U.S. Attorney's Office manual, nationwide DOJ manual, warns against that many counts. I think it sets a cap of about 15 unless there's extraordinary circumstances. I'm not familiar with a cap in the manual. It says there should not be a large number. Then it says ordinarily. It doesn't say an absolute cap. It says ordinarily that will not exceed. It's somewhere around 15. And then it says unless you won't capture the sentencing exposure, which here, I mean, each counts 20 years. There's no issue of not capturing sentencing exposure. Like you said, I feel a little backed into a corner. I'm asked why it was done that way. I wasn't involved in that decision. I don't know. It was a two-year conspiracy. Those mail fraud counts span the breadth of that conspiracy. I do know as a practitioner. You can take most simple mail fraud and take every drop of every time you drop a letter in the box and charge another count. Before the sentencing guidelines, when I was a sentencing judge, a long time ago, the prosecutors could do that and pick up five years for every letter you dropped. And, of course, the reaction to that was eventually they quit doing that. Now with the sentencing guidelines, I hope we're not going back to this proliferation of counts because it is confusing and can cause difficulty. But I'm not asking you to comment about that. But sometimes the colloquies here will drift back down to the U.S. Attorney's Office, and they'll say, yeah, some of those judges down there are annoyed about charging 31 counts in a straightforward kind of scheme. I will do my part to drift that back to the office, Your Honor. I don't want to take too much time on this, except I do want to make that point that it strikes me as being totally unnecessary and counterproductive. So beyond that, I'll leave it. Understood, Your Honor. At the end of the day, Judge Hoyt was in the best position to rule on that new trial motion. He was familiar with the pleas. He was familiar with the testimony. Under the Berry rule, which precludes a new trial based on impeachment evidence, he ruled completely properly in denying that new trial motion. There simply was not a secret deal for a five-year sentence. The PSR was supported by accurate information, which was corroborated. The district court applied the proper legal standard in terms of how to offset any losses. There is no error there. And any brutal error from the single statement that came out on cross-examination could not have been material in light of the overwhelming evidence of Dickerson's guilt. I'm happy to answer or try to answer any other questions that the panel has. Well, this isn't a question, but just a follow-up. I wanted to make sure what I said earlier was accurate. Given Judge Higginbotham's saying to send the message back, it's Section 215 of the U.S. Attorney's Manual. In order to promote the fair administration of justice, as well as the perception of justice, all U.S. attorneys should charge in indictments as few separate counts as are reasonably necessary to prosecute fully and successfully and to provide for a fair sentence. Indictments should be limited to 15 counts or less so long as such a limitation does not jeopardize successful prosecution or preclude a sentence appropriate to the nature and extent of the offense involved. I appreciate the cite, and I'll definitely pass the message back. By the time I read their manual. I may paraphrase that, Your Honor. Unless the court has other questions, I'll yield my time. Thank you, sir. Thank you. Your Honor, first I'd like to address the government's argument regarding the plea agreement being, as they say, tagged as evidence. The important part is that it was not presented to the jury. It was never offered. It was never admitted. The only information that the jury has regarding the plea agreement is what he — what Marion Young testified to. And although the government tries to allege that the 5K agreement was before the jury, that's not true. It's just simply not true. It was never introduced into testimony. The plea agreement was not in evidence. The only information to the jury was what was testified to, just because they mark an agreement and not produce any evidence. That just doesn't count. And also regarding the Court's concern, and just to make it clear, the government never did clarify Marion Young's agreement after the court — as you were saying, you know, at a minimum, it was not very clear. Now, as the government's argument is that Marion Young was saying five years of sloppiness of speech and that he didn't understand the ramifications of what he was saying, I mean, I think that that is more of an accurate understanding of what he was understanding his agreement was when he's talking to his friend on the phone rather than in front of the government who's deciding whether or not he's going to get this 5K deal. And he knows that he has to provide good testimony in order to get that because he's thinking he's going to get five years, which he did end up getting five years. So I wouldn't say that that was sloppiness of speech. It's probably more accurate. Now, regarding the amount of sentences that the other co-defendants received, it was — he received way more than any of the other co-defendants. And as you look, it's not that he was way more culpable than any of the other co-defendants. If anything, the billing was done at the chiropractor's office. Brittany Jesse was the one that had the most testimony about the problems with the billing. It wasn't Dickerson. He received 168 months. Young, 60. Graham, 80. Brittany Jesse, only one. Only one went to trial. Only one other defendant went to trial, right? No, Your Honor. Edward Graham was in trial along with Marion Young. But Edward Graham didn't testify. That was the problem with the Bruton error. I thought Dickerson and Graham were the only ones who went to trial. Yes. Did I say — I said one other person went to trial. Yes. Dickerson and Graham went to trial. Right. Of course the people who pled guilty and cooperated are going to get less. I mean, some people don't like how big that discrepancy is, but that's always the case. Well, Graham only received 80 months, and he was the one that received the benefit of all the courts' changes in regarding the objections to the sentencing enhancements regarding the 50 years. He granted that for Graham, but he didn't grant it for Dickerson, the loss amounts. It's not that there were different facts regarding each one in relation to those sentencing enhancements. There's a lot of difference whether you go to trial or not. Of course, the government, to go to trial or not, is the old colloquial expression among the criminal defense bar where the court charges a lot for the courtroom time. Now, that's sort of the street language of the lawyer, but the reality is that when — that the people who go to trial are going to face — that's why you have plea bargaining. That's what you're offering them. I mean, you wouldn't have any bargaining position if that weren't true. Yes, sir, and I think the best comparison would be him versus Marion Young. I mean, versus Edward Graham, where Edward Graham received all those — the sustaining of the objections, whereas Dickerson was denied the objections to the same issues. And then that's why there's such a big difference. There is a small difference in the criminal history category, but the main difference at that point was the government sustaining the objections when it came to Graham and not Dickerson. And so when it comes to a fair sentence and you look at the two, it just doesn't add up. And, Your Honor, regarding the relevant sentencing, I did want to — the relevant conduct, I did want to point out that in the PSR at paragraph 32, they said that he was — he was liable for the $578,070 — $5,788,768, but they said that was based on the clinics which were alleged and then, quote, additional fictitious claims submitted between 2005 and 2007. Now, there's no additional information regarding these additional fictitious claims. I don't see how there's any reliable indicia of liability regarding that matter. They can't just say, oh, and the other things. I mean, that's just — how are you supposed to defend against that? How are you supposed to — they can't just pull out a number and names. That doesn't even say what clinics were submitted. We don't even know where this information came from. It's just very vague. There's no breakdown of the calculations. Now, regarding the actual amounts that was proven — I think this whole discussion is just a little bit divorced from reality. I mean, I've seen a lot of these both as a lawyer and as a district judge. The PSR summarizes what's in the investigative file. So, yes, if the defense lawyer never saw these numbers from the insurance company, you go into court and pound the table and say, I don't know where these numbers are coming from, Judge, but usually the defense attorney should have all that information in — from the discovery from trial even. So it's — I just don't see it as you're presenting it as some surprise as PSR comes out and there's numbers, and, oh, my gosh, where did they come from? And if the defense lawyer doesn't have the data from the insurance company, you call probation, you call the prosecutor, and you say, where's — where are the billing records? I mean — Well, Your Honor, the defense counsel in this case did say that they didn't know where these victims — this wasn't proved in trial. They don't have the evidence. That wasn't the objections. Well, I know they said it wasn't part of the charge conspiracy. That gets into the relevant conduct. But I didn't see where they — there was an argument that they never had access to the discovery showing these insurance companies' numbers. I don't think there's anywhere in the record that it was turned over. Where would it be in — I mean, all right. In discovery, possibly, Your Honor. I'm not sure. I'm just saying — Never in the record. I mean, if you don't have it, you object at the sentencing, or even before then, and say, I need to see this stuff. I think my time is up, Your Honor. Thank you. That's it. Thank you.